IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL EDWARDS,                          )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )     No. 06 C 6399
                                         )
TWO UNKNOWN MALE CHICAGO POLICE          )
OFFICERS, AN UNKNOWN SUPERVISOR,         )
DEPARTMENT OF POLICE FOR THE CITY OF     )
CHICAGO, THE CITY OF CHICAGO,            )
OFFICER GREGORY GRAY, OFFICER            )
RICHARD MOTA, OFFICER STEFAN ZADURA,     )
SERGEANT ROBERT TIETZ, and OFFICER       )
TIMOTHY OBRIEN,                          )
                                         )
          Defendants.                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Edwards' second amended complaint ("complaint") alleges: excessive force and "false imprison[ment]" in violation of 42 U.S.C. § 1983 against "individual defendants" (count I); failure to train, supervise, and discipline in violation of § 1983 against the City of Chicago ("City") and the unknown supervisor (count II); false imprisonment in violation of Illinois law against the defendants (count III); and false arrest in violation of Illinois law against the defendant unknown officers (count IV).[1] Defendants Timothy O'Brien ("O'Brien"), Stefan Zadura ("Zadura"), Robert Tietz ("Tietz"), and City have moved for summary

_____

[1]After defendants' motion for summary judgment was filed, the parties stipulated to the dismissal of defendants Michael Malaniuk and Frank Migliore.

judgment on all claims.  Defendants Richard Mota ("Mota") and Gregory Gray ("Gray") have moved for summary judgment on the federal false arrest and state law claims.  Gray has moved for summary judgment on the excessive force claim.  The motion is moot to the extent summary judgment is sought by Mota, Gray, O'Brien, Zadura, and Tietz on a federal false arrest claim.  For the following reasons, the motion is granted in part as follows.  I grant summary judgment as to O'Brien, Zadura, and Tietz on counts I, III, and IV, as to Mota and Gray on counts III and IV, and as to the City on count II.  I deny summary judgment as to Gray on count I.

I.

Edwards filed a Local Rule 56.1 statement opposing summary judgment, but he did not file a response to defendants' Local Rule 56.1 statement.  Unless otherwise shown to be disputed in Edwards's Local Rule 56.1 statement,[2] the facts set forth in defendants' Local Rule 56.1 statement are deemed admitted.

Edwards was twenty-two years old at the time of the incident alleged in the complaint.  Gray, Mota, O'Brien, and Zadura are Chicago Police Officers.  Tietz is a Chicago Police Sergeant.  Spybar, a nightclub located at 646 North Franklin Street in

---

[2]A number of plaintiff's statements of fact contain citations to portions of deposition transcripts that have not been attached.

Chicago, is located in an area with other bars; the police are regularly summoned there.

At approximately 12:15 a.m. on July 16, 2006, Edwards and his friends went to Spybar.  Approximately an hour later, around 1:00 to 1:10 a.m., one of Edwards' friends, Jason Zavala ("Zavala"), was escorted out of the bar by security.  Five other patrons with whom Zavala was yelling back and forth also exited the bar.  Edwards and his friends followed them out to the street, and found the other patrons had Zavala on the ground and were beating him up.  Edwards and three of his friends tried to help Zavala by yelling, pushing, pulling, and grabbing at the attackers.

After pulling the attackers off Zavala and getting him off the ground, a Chicago Police squad car arrived with its lights activated.[3]  Mota and Gray[4] got out of the car and approached Edwards.  Edwards did not move away or make any threatening gestures.  Mota grabbed Edwards by the shirt, ripping off the

_____

[3]To the extent plaintiff attests that "three or four squad cars pulled up almost simultaneously[,]" his affidavit contradicts his earlier deposition testimony as well as the testimony of another deponent.  Also, plaintiff asserts that, at approximately 2:30 a.m., Mota and Gray notified Chicago Police Dispatch that they received information about a fight at Spybar and they were en route, citing a "Chicago Police Department Event Query" and "Chicago Police Department Dispatch Audio Tape Transcript of July 16, 2006."  Defendants object to these documents as lacking authentication and foundation.  Without any accompanying affidavit or testimony, I cannot discern what the event query document shows.

[4]The parties agree that the officers plaintiff refers to in his deposition as the Hispanic officer and his partner are Mota and Gray, respectively.

buttons.  Edwards was confused and shocked, and asked Mota why he was grabbing him.  Mota swore at Edwards.

Gray went to assist Mota because Edwards was bigger than both of them.  Gray grabbed one of Edwards' arms, and Edwards was slammed down on the hood of the car.  In his statements of fact, Edwards claims that both officers slammed him onto the hood of the car.  Although defendants object for various reasons to Edwards' statements of fact about being slammed into the hood of the car, they do not specifically object to the statements that both Mota and Gray participated in this action.  Edwards' friend, Patrick Dillon, testified that Mota and Gray handcuffed Edwards and "put him on the car."  Edwards testified that, "he had me from behind and threw me down like that, forcefully on the hood (indicating)."  Although Edwards' testimony on this point is ambiguous, he seems to refer to Mota.

Edwards was asked if Gray grabbed him, and he answered no.  When asked what Gray did to him physically, Edwards answered, "When he threw me in the police car, he was behind me, grabbing one of my arms."  When asked if Gray handcuffed him, Edwards answered no, testifying that Mota "most likely handcuffed [him] because he had control of [him]."  Edwards also attests that, as he lay on the front of the hood of the car, Gray "joined in, and the two of them pulled back [his] arms behind [his] back and put them in

handcuffs." When asked if Gray helped secure him from behind, Edwards answered yes.

When asked what happened after he was thrown down on the hood of the car, Edwards testified that he yelled at Mota and Gray that they were hurting his shoulder because he had had shoulder surgery, but "[t]hey kept pushing [his] arm up[.]" Edwards also yelled because the hood of the car was really hot and his shirt had been ripped off. Mota and Gray were swearing at Edwards. Mota and Gray pulled Edwards off the hood of the car by his arms, and took him to the police car. Mota slammed Edwards' face into the roof or door frame while putting him in the back of the car, knocking out his front teeth.

Edwards believes he heard police cars coming when he was already on the hood of the car. He believes other police officers were standing behind him. None of the other police officers approached, touched, or talked to Edwards. As Edwards sat in the back of the car, his friends and the other officers looked in and he shouted, "Look what they did to me!"

Mike Lucente, a Cook County Sheriff and Edwards' acquaintance, talked to Mota and Gray. James Caron ("Caron"), one of Edwards' friends, spoke to Mota or Gray. Mota told Edwards to get out of the car because he was being let go. Edwards initially refused to exit the car, demanding to go to jail so he could report what had happened. Lucente persuaded Edwards to get out of the car, telling

him he did not know what they were going to do to him. Edwards eventually agreed to get out of the car, and Mota and Gray took off the handcuffs, swore at him, and released him without charging him with a crime.

Edwards then went home. Edwards attests that, on the Monday following the incident, he went to the dentist. Edwards further attests that surgery was performed on his front teeth and mouth.

At least five to seven minutes elapsed from when Mota grabbed Edwards and when Edwards was released from the police car. By the time Edwards was released, other Chicago Police officers and an African-American sergeant were at the scene. Edwards heard other police cars approaching while he was on the hood of the car. None of the other officers had any physical or verbal contact with Edwards. The other officers were checking out the area around the bar and talking to the bouncers. Edwards does not remember what the other officers, besides Mota, looked like and he does not know their names.

Tietz is thirty-seven years old and white. He has no recollection of going to the scene of the incident or witnessing any of the events alleged, testifying that he "definitely would have remembered this incident if this would have happened." Dispatch records indicate that O'Brien and Zadura assisted a call for a disturbance at Spybar at approximately 2:34 a.m. According to dispatch records, they were on the scene sometime after the

initial responding officers, and they made a report to dispatch to close out the call at 2:46 a.m.  O'Brien and Zadura do not remember being involved in or witnessing any of the events alleged at one of the many stops they made that night.

When asked how, if he does not remember the incident, Mota knew that he was not at the Spybar "that evening in your squad car at the 1821H[,]" Mota answered that he "think[s] it's something [he] would remember, being there."  Edwards refers to the event query, which states "Papercar changed from 1821H to 1823H D/5P[.]"[5] Zadura testified that "paper car" is the term for whoever is originally dispatched to a job, but can change.  O'Brien testified that the vehicle assigned the paper car is responsible for doing the investigation and for coding it.  O'Brien testified that, "according to the event query and . . . the . . . attendance sheet, he "worked 1823 Henry[.]"  Referring to the event query, Zadura testified that he "was on 23 Henry[.]"  Zadura also testified that

---

[5]Plaintiff's claim that the defendant officers "changed among themselves which would be 'the paper car' with the minimal responsibility of writing an official police report of their actions and activities and observations[]" - thus relieving Mota and Gray of the responsibility for doing so - is not supported by the citations to the record.  Likewise, plaintiff's assertion that, "[f]ollowing their normal procedure," Gray, Mota, O'Brien, Zadura, and Tietz "made no official police report whatsoever regarding their contact with [plaintiff] and the physical violence visited upon him or witnessed on July 16, 2006[]" is not supported by the citations to the record.  To the extent plaintiff cites a Chicago Police Department policy and procedures regarding reporting, defendants object that the document lacks authentication and foundation.  Moreover, plaintiff fails to specify on which portion of the policy he relies.

1821H was the initial car. O'Brien testified that the event query says in which order cars were dispatched, not necessarily which car responded at what time. O'Brien also testified that the statement in the event query that the paper car was changed from 1821H to 1823H indicates to him that "1823 Henry car performed the functions of a preliminary investigation and provided an appropriate code[;]" and "5P is a code to resolve incidents that do not require a case report[,]" 5 meaning "disturbance other" and P meaning "other police service." O'Brien testified that either he or Zadura would have coded this particular incident.

Edwards cites a portion of Tietz's deposition testimony referring to an assignment sheet that Tietz said was from the "[f]irst watch, July 16."[6] Tietz testified that Gray was signed in for duty, and he was assigned to the 21H. Tietz testified that Mota was signed in as in attendance, and he was also assigned to the 21H car. Tietz has "no idea" whether the 1821H car responded to the Spybar that night.

---

[6]In the deposition transcript, counsel refers to a particularly page of the document as "IDL 121," presumably a bates number, although no document bearing that number is included in the "Attendance & Assignment Record[s]" provided by plaintiff. Moreover, defendants object that no foundation has been laid for the assignment record documents attached. To the extent plaintiff relies on these documents as evidence of the defendant officers' presence at the scene of the incident, I cannot discern what the documents show absent any accompanying affidavit or testimony.

When asked whether he would make a report if he saw Edwards get his face smashed into a squad car, spit his teeth out, and bleed, Zadura testified that "it depends on the situation." Zadura testified that, if he were fighting with an officer, then Zadura is not going to do a report. Zadura testified that it would not be his responsibility, but rather that of the officer who was charging him with fighting with the officer.

In 1995, Mota went to the police academy for six months of training, where he was trained in weapons, use of force, the law, how to properly execute arrests, how to use handcuffs, and how to place a handcuffed person into a squad car.[7] Mota had supervisors in each of his assignments. During the course of his career, Mota has received discipline from the Chicago Police Department.

In answering interrogatories, Edwards claims that "unknown supervisor(s)" watched other officers "use physical violence" against him "[f]ollowing their usual practice and procedure and in accordance with the training they have received from the police academy onward. Chicago Police Officers when arriving at drinking establishments throughout the city exert force first and ask questions later." Edwards also claims that "supervisors stand by or actively engage with patrol officers in the physical 'control'

_____

[7]Although plaintiff cites a Chicago Police Department policy and procedures regarding the use of force in an arrest, no such document is included in the record.

of persons at such drinking establishments believed to be involved in violent activity and/or in various states of inebriation."

In answering interrogatories, Edwards further claims that "Chicago Police Officers, following their training, have a practice and procedure of arriving at drinking establishments with a show of force and without first determining the actual circumstances of a given situation[,]" leading to "unwarranted batteries and the use of excessive force to innocent bystanders and business invitees . . . . " Edwards asserts that "the 'practice and procedure' of failing to train beat officers to avoid the use of excessive force and failing first to determine the need for it at all led directly to the injuries" he suffered. When asked for all incidents upon which he relies to support the allegation that the City has a practice and procedure of failing to train officers, Edwards states that he, "his friends, and other countless citizens of the community have observed Chicago Police officers on a routine basis using excessive force on members of the public who they deem to be 'troublemakers' and/or inebriated at public drinking establishments throughout the City of Chicago."

## II.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A genuine issue for trial

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)(2). I must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

III.

A. Excessive Force

Count I alleges that Edwards was subjected to excessive force by the defendant officers. Gray argues that the force he used was not unreasonable under the circumstances. Gray also argues that he is entitled to qualified immunity because "no case exists that would have instructed [him] that his pulling on Plaintiff's handcuffed arm to move him from the front of the squad car to the area of the door was unreasonable force." Edwards claims that Mota and Gray participated in the "beating," without specifying whether

11

the complained of force includes the force employed while he was at the hood of the car, the force employed while he was being put in the car, or both. Edwards merely describes the events as being "detained, handcuffed, impelled against the squad car, and [having] his front teeth knocked out[.]"

1. Qualified Immunity

Government actors performing discretionary functions enjoy qualified immunity and are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009) (citation omitted). The plaintiff discharges the burden of showing that the constitutional right was clearly established by pointing to a clearly analogous case establishing the right to be free from the specific conduct at issue or by showing that the conduct is so egregious no reasonable person could have believe it would not violate a clearly established right. *Chelios v. Heavner*, 520 F.3d 678, 691-92 (7th Cir. 2008).

"An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated constitutional rights." *Marion v. City of Corydon, Indiana*, 559 F.3d 700, 704-05 (7th Cir. 2009) (citing *Pearson*, — U.S. —, 129 S.Ct. at 822)). The Fourth Amendment, which prohibits unreasonable seizures, is used to analyze excessive force claims.

*Id.* at 705 (citing *Graham*, 490 U.S. at 394-95)). "Whether the force used to effect a seizure is excessive depends on the totality of the circumstances under an objective reasonableness standard."

*Id.* I must determine whether the officer's actions are objectively reasonable in light of the facts and circumstances with which he was confronted, without regard to his underlying intent or motivation. *Id.* (citing *Graham*, 490 U.S. at 397). Facts to consider include the severity of the crime, whether the suspect poses an immediate threat to the officers' or others' safety, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002) (citing *Graham*, 490 U.S. at 396). If there is no deprivation of a constitutional right, then the officer is immune from liability. *Marion*, 559 F.3d at 706 (citations omitted); *Akande* v. Grounds, 555 F.3d 586, 590 (7th Cir. 2009).

A fight occurred outside Spybar. When Mota and Gray arrived, Edwards did not attempt to flee or make any threatening gestures. No facts have been adduced that Edwards offered any resistance. Edwards is bigger than Mota and Gray. Taking the facts in the light most favorable to Edwards, Mota and Gray threw Edwards against the hood of the car, Gray assisted Mota in handcuffing Edwards, and Mota and Gray pulled Edwards off the hood of the car by his arms. Edwards yelled at Mota and Gray that they were hurting his shoulder because he had had shoulder surgery, but

"[t]hey kept pushing [his] arm up[.]"  Edwards also yelled because the hood of the car was really hot and his shirt had been ripped. Mota alone slammed Edwards' face against the door frame or roof of the car, knocking out his teeth.

Gray argues that the only force he used was pulling Edwards' already handcuffed arms when assisting in moving him from the hood of the car to the door, disregarding Dillon's testimony that Mota and Gray handcuffed Edwards and "put him on the car" as well as Edwards' testimony that "[t]hey kept pushing [his] arm up[.]" Gray does not discuss, nor cite any authority addressing, the impact of the facts showing that he participated in putting Edwards on the car and pushing on his arm.

Edwards cites an analogous case denying summary judgment where the plaintiff claimed he fully complied with the officer's instructions and never resisted arrest yet he was forcibly pushed against the squad car several times, prompting him to yell for help and causing him to suffer a hernia, and his arm was wrenched up behind his back and he was handcuffed tightly, causing nerve damage. *Hill v. Miller*, 878 F. Supp. 114, 115-17 (N.D. Ill. 1995) (Aspen, J.).  It was clearly established at the time of Edwards' detention that police officers cannot shove, push, or assault innocent citizens without provocation. *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)).  It was also established that police

14

officers cannot use excessively tight handcuffs and violently yank
arrestees' arms where they did not resist arrest, did not disobey
police orders, did not pose a threat to the officers' or others'
safety, and were suspected of committing only minor crimes.
*Id.* (citations omitted).   Taking the facts in the light most
favorable to Edwards, Gray employed more force than pulling
Edwards' arms once he had been handcuffed to move him such that I
cannot determine that the force was objectively reasonable.
Therefore, I deny summary judgment for Gray on count I.

### 2.Failure to Intervene

O'Brien, Zadura, and Tietz argue that summary judgment should
be entered in their favor because Mota and Gray have been
identified as the alleged wrongdoers.   O'Brien and Zadura also
argue that summary judgment should be entered for them because they
were dispatched to Spybar almost ninety minutes after the time when
Edwards claims the incident occurred, and once there had no contact
with him.   Tietz also argues that he is entitled to summary
judgment because he does not match Edwards' description of the
unknown supervisor as African-American, and there are no
allegations of any wrongdoing by him.   Edwards does not respond to
the foregoing arguments.

Edwards does not contend that O'Brien, Zadura, and Tietz
participated in the force used against him, but he argues that
O'Brien, Zadura, and Tietz are liable for failure to intervene to

stop "the battery" committed by Mota and Gray. A plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right, but direct participation is not required. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (citation omitted). Section 1983's personal responsibility requirement is satisfied if an official acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights. *Id.* (citation omitted). Police officers may be liable where they have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights by using excessive force but fail to do so. *Id.* (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). An officer has a duty under § 1983 to intervene to prevent the use of excessive force if he is informed of the facts that establish a constitutional violation and has the ability to prevent it. *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008) (citation omitted). The plaintiff must produce sufficient evidence that an officer had reason to know that excessive force was being used and a realistic opportunity to intervene to prevent the harm from occurring. *Id.* (citing *Yang*, 37 F.3d at 285).

Taking the facts in the light most favorable to Edwards, he believes that he heard police cars coming when he was already on the hood of the car. Edwards believes that other police officers were standing behind him. And other police officers saw Edwards

sitting in the police car and walked away. O'Brien and Zadura responded to a disturbance at Spybar on the night of the incident at a time later than the time when Edwards testified that the incident took place. Neither has Edwards adduced any evidence that O'Brien, Zadura, or Tietz (who, as noted above, does not match the description of the sergeant Edwards says he saw at the scene) had reason to know that excessive force was being used or had a realistic opportunity to intervene to prevent it. Even if O'Brien, Zadura, and Tietz were somewhere behind Edwards, no evidence has been presented regarding what they were doing or what they saw. Therefore, I grant summary judgment for O'Brien, Zadura, and Tietz on count I.

B. *Monell* Liability

Count II alleges that the City is liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), based on the failure to train, supervise, and discipline. The City moves for summary judgment on count II, arguing that Edwards cannot show that it failed to adequately train, supervise, or discipline its police officers, or that any lack of training, supervision, or discipline rises to the level of deliberate indifference. Edwards argues that the City is liable based on its policy or custom of allowing excessive force cases like his "to occur with shocking regularity." Edwards also argues that the City is liable based on its failure to sufficiently train, discipline, or supervise its officers.

A municipality cannot be liable under § 1983 unless there is an underlying constitutional violation by one or more of its officers. *Marion*, 559 F.3d at 706 (citation omitted). A municipality cannot be held liable under § 1983 on a *respondeat superior* or vicarious liability theory. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citing *Monell*, 436 U.S. at 694). A municipality is only liable under § 1983 when its policy or custom results in a constitutional injury to the plaintiff. *Id.* A plaintiff may demonstrate the existence of an unconstitutional policy or custom through: (1) an express policy that, when enforced, causes the loss; (2) a "widespread practice" that constitutes a "custom or usage" that causes the loss; or (3) a person with "final policymaking authority" who causes the loss. *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004)); *see also Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir.2005) (quoting *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995)).

A municipality is "liable for the violation of an individual's constitutional rights for failure to train adequately its officers only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact." *Jenkins*, 487 F.3d at 492 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). "Proof of

deliberate indifference requires more than a showing of simple or even heightened negligence." *Id.* (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997)) (alterations omitted). Deliberate indifference is found "when such indifference may be considered a municipal policy or custom." *Id.* (citing *City of Canton*, 489 U.S. at 389). This may arise in two circumstances: (1) when, given the duties assigned to certain officers or employees, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the deficiency exhibits deliberate indifference on the part of the municipal policymakers;" or (2) when "a repeated pattern of constitutional violations makes the need for further training . . . plainly obvious to the city policymakers." *Id.* (internal quotations omitted).

The focus is the "adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390. It is not sufficient to show that a particular officer "may be unsatisfactorily trained[.]" *Id.* at 390-91; *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997). It is also not sufficient to prove that "injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury causing conduct." *City of Canton*, 489 U.S. at 391. Adequately trained officers occasionally make mistakes, which "says little about the

training program or the legal basis for holding the city liable."
*Id.* Moreover, to establish liability, the identified deficiency in
the training program must closely relate to the ultimate injury.
*Id.*

In support of his custom or policy argument, Edwards relies on
the failure of any of the defendant officers to make a written
report the incident; the changing of the paper car from one vehicle
to another; and O'Brien's, Zadura's, and Tietz's failure to
intervene. Edwards cites no facts apart from the facts relating to
the incident in question. Edwards also cites two portions of the
policy and procedures manual regarding reporting. He does not
elaborate on their significance. The portions of the document
cited state procedures for making reports in certain situations,
but Edwards has adduced no evidence that these procedures apply so
as to require a report to have been made regarding this incident.
Nor has Edwards presented any evidence that - even if these
procedures should have been but were not followed in this instance
- that they are routinely not followed in other cases such that
there is a widespread practice of not following making written
reports.

In support of his failure to train, discipline, or supervise
argument, Edwards relies on the defendant officers' presence at
Spybar; the reasonableness of inferring that, if the City conducted
proper training and supervision and administered proper discipline,

officers would be properly trained; the fact that the use of excessive force is a violation of constitutional rights; O'Brien's, Zadura's, and Tietz's failure to intervene; and the failure to discipline any of the defendant officers for participating in the use of force against Edwards and/or failing to report it. Again, Edwards cites no facts apart from the facts relating to the incident in question. Edwards has not presented any evidence regarding the training, supervision, or discipline of any of the defendant officers, much less shown that such training, supervision, and discipline are so obviously inadequate as to result in the violation of constitutional rights. Nor has Edwards adduced any facts of a repeated pattern of constitutional violations.

Because Edwards has not shown a policy or custom of allowing excessive force nor a failure to train, discipline, or supervise, I grant summary judgment for the City on count II.

### C. State Law Claims

Count III alleges false imprisonment and count IV alleges false arrest in violation of Illinois law. O'Brien, Zadura, Tietz, Mota, and Gray argue that these claims are barred by the statute of limitations because, although the initial complaint was timely filed, Edwards did not amend the complaint to name the individual officers until approximately five months after the statute of limitations had run. *See Hunt ex rel. Chiovari v. Dart*, — F. Supp.

2d —, No. 07 C 6003, 2009 WL 1162133, at *2-5 (N.D. Ill. Apr. 30, 2009) (Cole, Mag. J.) (concluding federal and Illinois rules precluded amendment to complaint absent mistake involving failure to name unknown parties prior to expiration of statute of limitations). Edwards responds that equitable tolling applies because the officers' identities were "hidden" at the time of the incident, he was not allowed to go to the police station to file a complaint at that time, and he and his counsel exercised due diligence in requesting the production of relevant documents.[8]

The statute of limitations for the state law claims is one year. *See* 745 Ill. Comp. Stat. 10/8-101(a). The incident occurred on July 16, 2006. The initial complaint was filed on November 22, 2006. The second amended complaint was filed on December 27, 2007.

The cases on which Edwards relies do not advance his argument, as he has not demonstrated that he exercised due diligence prior to the time when the statute of limitations would have run. *See Davis v. Frapolly*, 742 F. Supp. 971, 974-75 (N.D. Ill. 1990). Edwards argues that he exercised due diligence by submitting a request for the production of certain documents. As a preliminary matter, it is unclear whether this request actually was made within the limitations period as it is undated - although it must have made sometime after this lawsuit was filed as it contains the case

---

[8]Plaintiff fails to respond to O'Brien's, Zadura's, and Tietz's alternative argument that there is no evidence that they participated in detaining, or had any contact with, Edwards.

caption.  Nevertheless, assuming the request was made within the limitations period, Edwards has not shown that he undertook any other action following the incident to attempt to ascertain the defendant officers' identities.  I conclude that the state law claims against the defendant officers are time-barred, and I grant summary judgment for O'Brien, Zadura, Tietz, Mota, and Gray on counts III and IV.

IV.

For the foregoing reasons, summary judgment is granted as to O'Brien, Zadura, and Tietz on counts I, III, and IV, as to Mota and Gray on counts III and IV, and as to the City on count II.  Summary judgment is denied as to Gray on count I.[9]

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated:    June 8, 2009

---

[9]Mota did not move for summary judgment on this count.

23